IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

```
⌐ ‖  F D
```

02 SEP 10 PM 2: 40

.... DISTRICT COURT
N.D. OF ALABAMA

**ENTERED**

SEP 1 0 **2002**

| | |
|---|---|
| **CARL WRIGHT, individually and on behalf** **of others similarly situated,** ) ) | |
| Plaintiffs, ) ) | |
| **FELICIA D. CARTER,** ) ) | |
| Plaintiff-Intervenor, ) ) | Civil Action Number |
| **vs.** ) ) | **93-C-1530-S** |
| **SOUTH CENTRAL BELL, BELLSOUTH** **TELECOMMUNICATIONS, and** **COMMUNICATIONS WORKERS** **OF AMERICA,** ) ) ) ) ) | |
| Defendants. ) | |

### MEMORANDUM OPINION ON LIABILITY ISSUE

This case was brought as a class action by Plaintiff Carl Wright, pursuant to Fed.

R. Civ. P. 23(b)(2), against his employer BellSouth Telecommunications, Inc., d/b/a

South Central Bell ("SCB"), and his union, the Communications Workers of America

("CWA").[1]  Plaintiff posits his claims on Title VII of the 1964 Civil Rights Act, 42

U.S.C. § 2000e, and 42 U.S.C. §§ 1981, 1981A.  Specifically, Plaintiff claims that his

employer's use of its Technical Telephone Ability Battery ("T-Tab") test had an adverse

---

[1]  CWA is a Defendant solely for purposes of Fed. R. Civ. P. 19.

impact on SCB's black employees, that the test was not validated, and that the test was not justified by business necessity. Originally, Plaintiff and the class members also claimed that SCB's procedures for waiver of the T-Tab test were the product of intentional racial discrimination. However, during trial, Plaintiffs abandoned their claims regarding the waiver procedures. (TT at p. 488.)

The Court has certified the case as a class action consisting of all black employees of SCB who have taken and failed the T-Tab test at anytime since September 2, 1990. The case was bifurcated for trial. This opinion only addresses the liability aspect (Phase I) of the case.

Based on the facts embodied in the opinion which follows, the Court finds and concludes that the T-Tab test had an adverse impact on black employees of SCB, the test was not related to job performance and SCB failed to consider alternative selection methods that would have caused a less adverse impact.

## I. FACTS

**A.     Plaintiff Carl Wright.**

Carl Wright is a black male citizen of the United States and of the State of Alabama. He is a high school graduate. He attended a technical school sponsored by International Telephone and Telegraph ("ITT") in Birmingham, Alabama. At that school, he took courses in basic electricity, 1A and 2A key system installation and maintenance, electronic key system installation and maintenance, as well as 3100 PBX installation and

2

maintenance. (Court's Ex. ("CX") 1 at ¶ 52.) Wright also attended the Birmingham Metropolitan Area Skills Center, where he took courses in typing, ten-key adding machines, and accounting.

Wright was hired by SCB in March 1977 as a repair clerk.[2] One year later, Wright was promoted to the position of Installer Repair Technician ("I/R Repair Technician"). While working in this technical position, Wright received on-the-job training and attended training courses provided by his employer. In addition to the on-the-job technician training, Wright voluntarily took SCB-sponsored courses in pole climbing, ladder handling, and residential installation and repair. He also took a basic electricity course at Bessemer Technical College, under SCB's tuition refund plan. As a technician, Wright's duties included basic residential installation, which involves, among other things, handling cross-connects, running drops from poles to homes, testing pairs with the central office, making cuts, installing telephones and telephone jacks, and repairing telephone jacks.

Later, Wright's job title changed from I/R Technician to Services Technician. Like the I/R Technician, the Services Technician is considered a technical position. Wright remained in the latter position until March 28, 1982. SCB concedes that, Wright competently performed his duties while employed in the technical positions. (CX 1 at ¶ 21.)

---

[2] For purposes of the collective bargaining agreement between SCB and CWA, however, Wright's seniority date is June 12, 1978.

3

During dislocations arising from the court-ordered divestiture of AT&T, Wright was reduced to the non-technical position of AT&T Maintenance Administrator for three years.  Then, for fifteen months, Plaintiff was laid off.  On recall in 1987, he was assigned the non-technical position of Dispatch Clerk, a position in which he worked until November 1989, when he became a Network Clerk.  He worked in the latter non-technical position until at least the time of the trial in this case.

On numerous occasions since 1991, Wright has sought promotion from the Network Clerk position to a higher paying technical position.  However, the T-Tab test has presented a barrier.  Wright has unsuccessfully taken the T-Tab test on three occasions.  He last took and failed the test on October 11, 1991.  Because Wright has not passed the T-Tab test and is not eligible for a waiver, SCB deems him unqualified for technical jobs. (*See* CX 1 at ¶¶ 35-36.)


**B.**    **The T-Tab Test.**

In 1984, after Wright had been reduced to a non-technical position, SCB, as an operating company of AT&T,  began using the T-Tab test to screen applicants for hiring, transfer, and promotion to seventeen technical positions.[3]  (Defs.' Ex. ("DX") 233 at p. 1; Pls.' Ex. ("PX") 24 at pp. 2-3.)

---

[3] Prior to its divestiture, AT&T undertook some of the validation efforts discussed below.  Unless necessary for the sake of clarity, the Court will collectively refer to SCB and AT&T as SCB.

4

The T-Tab passing score for incumbent employees was set at thirty-seven, while the passing score for non-incumbents was thirty-nine.  Applicants who where unable to obtain a passing score could retake the test six months after failing the T-Tab test for the first time.  After the second failure, the applicant was disqualified from taking the T-Tab test for at least one year.

The T-Tab test consists of three separate ability tests: (1) Number Groups, (2) Problem Identification, and (3) Visual Scanning.  (DX 233 at pp. 2-3.)[4]  SCB selected the three tests from a larger experimental battery of twelve ability tests.

SCB admits that the T-Tab test has an adverse impact on its black employees.[5]

_____

[4]  SCB describes the three tests as follows:

> Number Groups: Designed to assess inductive reasoning.  Required the examinee to find groups of numbers in rows of digits.  It is a 20-item test with a seven-minute time limit.

> Problem Identification: Assess sensitivity to problems and potential problems.  It is a 20-item test with a ten-minute time limit.

> Visual Scanning: Measures the ability to scan a wide visual field and anticipate consequences of various steps.  Examinees are given a map and asked to find the shortest route from a given starting point to a destination.  It is a 20-item test with a 12-minute time limit.

(DX 233 at p. 2.)


[5]  On April 1, 1994, SCB replaced the T-Tab with another cognitive "paper and pencil" test: the General Qualifications Test ("GQT").  (*See* CX 1 at ¶ 28.)  SCB denies that its decision to discontinue using the T-Tab was occasioned by the current litigation, which began on July 30, 1993.  In the current action, Wright does not challenge SCB's use of the GQT.

**C.**     **SCB's Validation *Vel Non* of the T-Tab Test**.

Beginning in the late 1970s, AT&T began a series of job analyses, culminating in validation studies completed between 1983 and 1986. (*See* TT at pp. 512, 543; DX 216, 219, 220, 221, 222, 226, 228, 253.) The validation research focused on three entry level jobs, that accounted for nearly all of the entry level jobs into the craft work force at more than fifteen of AT&T's operating companies. The three entry level jobs upon which the validation research focused were: Installation/Repair Technician, Outside Plant Technician and Frame Repair Attendant. (DX 233 at p. 2; DX 216 at p. 12.) SCB participated in the job analysis for Frame Repair Attendant, but did not participate in the job analyses for Installation/Repair and Outside Plant Technician. The validation sample consisted exclusively of 493 incumbents with not more than two years of experience.

The studies found that the T-Tab test was valid and that the test was transportable to the jobs of Cable Repair Technician, Cable Splicing Technician, Cable Splicing Technician Helper, Central Office Technician, Equipment Technician, Equipment Technician Helper, Frame Attendant, Outside Plant Technician, Plant Assigner, Power Technician, Services Technician, Switching Equipment Installation Technician, Switching Equipment Technician, Systems Technician, Technician Helper, Test Desk Technician, and Toll Testing Technician. (PX 24 at pp. 2-3.)

In 1994, BellSouth contracted with Psychological Services, Inc. ("PSI") to develop and validate a test battery for specific BellSouth operating companies, including SCB. PSI completed a job analysis of all 102 non-management jobs and identified the most

important work activities and abilities for each job.  The PSI study found significant relationships between the test battery and job performance.  (DX 223 at pp. 4-5).

In August 1995, as a part of the defense in this action, SCB's expert, Dr. Kathleen Lundquist, completed a "Revalidation of Technical Telephone Ability Battery for BELLSOUTH Technical Jobs." (*See* DX 233.)  This study involved six jobs: Cable Repair Technician, Cable Splicing Technician, Facility Technician, Electronic Technician, Outside Plant Technician, and Services Technician. A criterion-related validation methodology was utilized to determine the validity of these technical jobs. (*Id.* at p. 5.) Transportability evidence was used to substantiate the validity of the T-Tab test for other jobs in a job sub-family. The performance measures were based largely on the PSI study.  (*Id.* at pp. 2, 3, 5, 6.)  Dr. Lundquist concluded that "[t]he validation analyses showed significant validity, however, the magnitudes of the validity coefficients were small."  (*Id.* at p. 23.)

## II. THE APPLICABLE LAW

Title VII prohibits employment practices that, although neutral in application, have a disparate or adverse impact.  To establish a prima facie case of racial discrimination in disparate impact cases involving written employee selection examinations, the plaintiff must first establish that the challenged examination has an adverse racial impact. *Hamer v. City of Atlanta*, 872 F.2d 1521, 1524 (11th Cir. 1989).  Once the plaintiff establishes adverse impact, "the burden shifts to the employer to prove that the test is job related." *Id.*

(citations omitted).  If the employer establishes that the test is job related, the burden then

shifts back to the plaintiff to prove that the employer failed to consider alternative

selection methods that would have caused less adverse consequences.  *Id.* at 1524-25

(citations omitted).

Defendants in the present case have admitted that the T-Tab test has an adverse

racial impact.  (CX 1 at ¶ 37.)  Therefore, the only issues for this Court are whether SCB's

test is job related and consistent with business necessity.  If so, the Court must determine

whether SCB considered appropriate alternative selection methods. [6]

The Equal Employment Opportunity Commission has issued "Uniform Guidelines

on Employee Selection Procedures" ("Uniform Guidelines") to assist in determining

whether employment tests are job related.  The Supreme Court has noted that the Uniform

---

[6]  In addition to establishing job relatedness, employers must also establish that their use
of the challenged test is "consistent with business necessity."  42 U.S.C. § 2000(e)-2(k)(1)(A)(i)
(1994); *Hamer*, 872 F.2d at 1534 ("At no point in this case, in the testimony or the briefs, is
there any reference to whether the test given was a business necessity.  It is apparently assumed
by all of the parties ... that once job relatedness was shown, a separate showing of business
necessity was unnecessary.").  As the Eleventh Circuit has recognized,

> [t]he business necessity test is part of the employment discrimination law of [the
> Eleventh Circuit].  Business necessity is closely akin to job relatedness and the
> terms are often interchanged.  Job relatedness is used in analyzing the questions
> or subject matter contained in a test or criteria used by an employer in making
> hiring or promotional decisions.  Business necessity is larger in scope and
> analyzes whether there is a business reason that makes necessary the use by an
> employer of a test or criteria in hiring or promotional decision making.

*Hamer*, 872 F.2d. at 1533.  Because this Court finds that SCB's use of the T-Tab was not job
related, the Court need not reach the issue of whether "there is a business reason that makes
necessary" SCB's use of the T-Tab.  *See id.* at 1533.

Guidelines are "entitled to great deference." *Id.* at 1524 (citing 29 C.F.R. § 1607; *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)).  Pursuant to the Uniform Guidelines, employers may establish job relatedness by relying on certain test validation methods. *Hamer*, 872 F.2d at 1525.

The Uniform Guidelines currently recognize three methods for validating selection tests: (1) content validity studies, (2) construct validity studies, and (3) criterion-related validity studies. 29 C.F.R. § 1607.5(A).  In the present case, there is no evidence that SCB attempted to validate the T-Tab using content or construct validity.  (Trial Tr. at pp. 62-65.)  Instead, the evidence establishes that SCB used the criterion-related method to validate the T-Tab.  (*Id.*; *see* Defs.' Ex. 233 at p. 1.)

A "criterion-related validity study should consist of empirical data demonstrating that the selection procedure is predictive or significantly correlated with the important elements of job performance." 29 C.F.R. § 1607.5(B).  This relationship between test scores and job performance is expressed as a "correlation coefficient."

## III. ANALYSIS

**A.    The T-Tab Test's Correlation With Job Performance.**

The Court credits the opinions of Plaintiffs' experts Dr. Gerald V. Barrett[7] and Dr.

---

[7] Dr. Barrett is a recognized expert in Industrial and Organizational Psychology, including testing, as well as an expert in statistics.  At the time of the trial, he was a professor of Psychology at the University of Akron, where he has worked for twenty-two years.  In the past, he has served as a chair of the University's Psychology Department.  Dr. Barrett is a member of the APA's Division 14 and he has received several awards from the APA.  He has also been

Paul Richard Jeanneret[8] that there is no significant positive correlation between SCB's T-Tab test and job performance.  (PX 24A at pp. 9-14; TT at pp. 65-79, 920-21; PX 147 at p. 4.)  The Court agrees with Dr. Jeanneret, who opined that race is a more influential predictor of performance on the T-Tab test than job performance.  (PX 28A at p. 31; TT at p. 235) (noting that the T-Tab was "not a test battery that [he] would ever recommend using").  Dr. Barrett convincingly found that black employees had lower mean T-Tab scores than their white counterparts, but the black employees did not have correspondingly lower job performance ratings.  (PX 24A at p. 50; *see* TT at pp. 289-93.)

While SCB's expert, Dr. Lundquist, found significant positive correlation

---

honored by Division 14, where he is a Division 14 fellow.  The Division has also honored Dr. Barrett by bestowing upon him a Professional Practice Award.  In addition to his teaching and professional associations, Dr. Barrett runs a human resources consulting firm, Barrett and Associates, which develops and validates human resource related tests.  Finally, Dr. Barrett is a Diplomat.  The Diplomat designation indicates that he has passed a test, as well as practices and made accomplishments in the filed of Industrial and Organizational Psychology.

[8] Dr. Jeanneret, who has a Ph.D. in Industrial and Organizational Psychology, is an expert in test construction, validation of tests, job analysis and the general principles of Industrial and Organizational Psychology.  In most instances, Dr. Jeanneret provides expert testimony on behalf of defendants in cases involving test selection, validity and job analysis.  Since 1969, he has gained extensive experience with employment test validation.  He is employed with Jeanneret and Associates, Inc., a management consulting firm with particular specialization in human resource issues.  His firm is generally hired by private sector companies, including Conoco, Houston Lighting & Power, and Exxon, to construct or validate tests used for employee selection purposes.  Dr. Jeanneret is a member of the American Psychological Association's ("APA") Division 14, which focuses on Industrial and Organizational Psychology issues.  He has been honored by Division 14 as a Fellow.  Fellows are division members who distinguish themselves by their contributions to the filed of Organizational Psychology.  Dr. Jeanneret has also received other awards for his work.  In 1990, he was awarded the Distinguished Professional Contributions Award, specifically for his work in job analysis and validation research.  Dr. Jeanneret is a consulting editor for the *Journal of Applied Psychology* and a panel editor for *Personnel Psychology*.

coefficients between test scores and job performance, the accuracy of these findings is belied by the opinion of Plaintiffs' statistical expert, Dr. Edwin Bradley, Jr.,[9] whom the Court credits.  (PX 147; TT at pp. 1015-1116.)   The Lundquist calculations did not adequately take into consideration the impact of test scores from two "outliers."  (TT at p. 1024-26.)   Specifically, Dr. Lundquist failed to consider the impact of the "high score obtained by a white male and the lowest score obtained by a black female."  (*Id.* at 1025.)   By failing to consider the impact of these two outlier scores in her calculations,  Dr. Lundquist's correlation coefficients were unduly influenced. (*Id.*)   As Dr. Bradley testified, when the sample size is 732, the final calculation should not be "sensitive" or "highly dependent" on a few outlier observations. (*Id.* at p. 1028.)   When the final calculations are highly dependent on a few outlier observations, the researcher should discard the outlier scores.  (*Id.* at 1024-30.)

Dr. Bradley concluded that when the outlier scores are discarded and the data recalculated, most of the statistically significant positive correlations found by SCB's expert were either statistically insignificant or  lacked "practical significance." (*See* PX147; TT at pp. 1015-1116.)[10]   Dr. Bradley reached this conclusion by first examining

---

[9]   Dr. Bradley earned a doctoral degree in statistics in 1969.  At the time of the trial, Dr. Bradley was the Graduate Program Director and a professor in the Biostatistics Department at the University of Alabama at Birmingham.  Dr. Bradley has numerous professional publications and has served as a peer referee for close to ten journals that publish statistical articles.  He has directed doctoral dissertation research in the field of statistics and has been accepted in federal courts as an expert in the field of statistics.

[10]   "[S]tatistical significance is not the same as practical significance because in isolation [statistical significance] tells nothing about the importance or magnitude of the differences."

11

the six jobs and eight performance measures used by Dr. Lundquist to find a positive correlation between the test and job performance. (*See* PX 147 at p. 8; DX 233 at Ex. 18.) By multiplying the six jobs and eight performance measures, both Dr. Lundquist and Dr. Bradley examined a total of forty-eight potential correlations between the jobs viewed individually and job performance. Once the outlier scores were omitted, there was no statistical association between the T-Tab test and any of the potential forty-eight individual performance measures. (TT at p.1048.) While combining the performance ratings for <u>all</u> six jobs resulted in two <u>statistically</u> significant positive correlations, on two out of eight performance measures, these two statistically significant correlations did not reach <u>practical</u> significance. (PX 147 at ¶¶ 2-3; pp. 7-8; *see* TT. at pp. 1048-49.)

In other words, there was no <u>practical</u> significance associated with the two <u>statistically</u> significant correlations because the remaining forty-six correlations indicated no relationship between test scores and performance. Virtually all of the performance ratings were determined by some factor other than the T-Tab score. (TT at p. 1049; PX 147 at ¶¶ 2-3); *see Boston Chapter, NAACP, Inc. v. Beecher*, 504 F.2d 1017, 1024 (1st Cir. 1974) (upholding the district court's finding that two statistically significant correlations, from twelve performance scales, lacked <u>practical</u> significance).

Even when the outlier scores are included, Dr. Lundquist's finding of statistical significance between the T-Tab and job performance was contradicted by Plaintiffs'

---

*Bilingual Bicultural Coalition On Mass Media, Inc. v. FCC*, 595 F.2d 621, 642 n. 57 (D.C. Cir. 1978) (citation omitted).

experts.  Dr. Bradley determined that "over eighty percent of the people performed

satisfactory [sic], regardless of whether they passed or failed the test."   (TT at pp. 1052-

53.)  Thus, opined Dr. Bradley, there was "no statistically significant association" between

acceptable job performance and test scores.   (PX 147 at ¶ 5; PX 147 at p.13.)

> Q.    All right.  In regard to African-American employees,
>        you determined that the [T-Tab] did not have any
>        significant correlations to performance, correct?
>
> A.    For African-American employees as a group across all
>        the jobs in my study, that is correct.
>
>                              ....
>
> Q.    And you testified also that for white employees [sic]
>        and  test-takers, you could find no significant
>        correlation between   their performance and their [T-
>        Tab] results, correct?
>
> A.    Yes, sir, that is correct.

(TT at pp. 798-99, 806-07.)

"Virtually few, if any, significant correlations existed between T-Tab scores and

job performance in the Lundquist study."  (TT at p. 66; *see* DX 233 at Ex.18.)  Out of over

forty-eight potential correlations, Dr. Lundquist found only <u>eight</u> significant correlations.

(DX. 233 at Ex. 18.)  The highest significant correlation was a negative .29, indicating a

relationship between high test scores and low performance ratings.   (TT at pp. 65-66, 69.)

With so few significant <u>positive</u> correlations, there is a likelihood that the significant

correlations occurred by chance.   (TT at  pp. 73, 75; PX 28A at pp. 31-32.)

Not only were Dr. Lundquist's results likely caused by chance, but the few

13

significant positive correlations, between test scores and performance were of a "low magnitude." (TT at p. 66; *see* DX 233 at Ex. 18.) A zero correlation indicates no relationship between test scores and performance, while a 1.0 correlation represents a perfect positive correlation. (TT at pp. 76-77.)

Therefore, a correlation of .50 represents a very high correlation, (*id.* at p. 75), while a correlation close to .11 represents a correlation "very close to zero ...." (TT. at p. 77.) Given these parameters, Dr. Lundquist's statistically significant positive correlations of .01 to .15 were of "low magnitude." Indeed, the highest positive correlation of .15 was still very close to zero. *See Ensley Branch of the NAACP v. Seibels*, 616 F.2d 812, 818 (5th Cir. 1980) (upholding district court's finding that correlations of "low magnitude" held no "practical significance"); *Bilingual Bicultural Coalition*, 595 F.2d at 642 (noting that differences of small magnitude may not justify recognition).

The evidence that the T-Tab did not predict performance at SCB is even more compelling when non-SCB data are excluded from the correlation analyses. Dr. Lundquist's sample population included SCB employees, as well as employees from other Southern Bell companies. (TT at pp. 805-10.) Dr. Lundquist admitted that her data might have produced different results if she had evaluated solely SCB employees, without the other AT&T employees. (*Id.* at p. 811.) When Dr. Bradley excluded the data relating to the non-SCB employees, he found <u>no</u> statistically significant correlation coefficients between test scores and performance for SCB employees. (*Id.* at pp. 1053-1055; PX 213.) The Court credits that finding.

14

Moreover, some of the positive correlations found by Dr. Lundquist appear to be the result of what Dr. Barrett describes as the "aggregation fallacy." (TT at p. 70.)  That is, some of the significant positive correlations occurred because of a high correlation between certain performance measures and the scores of a racial sub-group.  (*Id.* at pp. 70-72.)  For example, while there was no correlation between certain performance measures and test scores for either African-Americans or Caucasians, there was a significant correlation of .38 between the test scores for Hispanics and performance on those same measures. (*Id.* at pp. 71-72.)  Thus, the significant correlations for Hispanics, on certain performance measures, may have skewed the aggregate upward for all races.  (*See id.* at pp. 70-72.)

Crediting the opinions of Plaintiffs' expert witnesses, the Court finds and concludes that the T-Tab test was invalid because it did not accurately predict job performance.

**B.**      **The T-Tab Test's Measurement *Vel Non* of the Important Abilities Associated With The Technical Jobs Studied.**

The Court is persuaded by the testimony of Drs. Barrett and Jeanneret that the T-Tab test only partially measures what are deemed to be important job-related abilities, and does not measure some other highly rated and presumably "important" abilities for the jobs of interest. (TT at pp. 43-46; PX 24 at pp. 2-9; PX  24A at pp. 6-8; PX 28A at p. 13; *accord* TT at pp. 235-41, 933-37.)

In performing one of its background validity studies, SCB evaluated at least twenty-

15

six abilities associated with the technical jobs for which the T-Tab test serves as a screening device. (TT at p. 39.) Of those twenty-six abilities, SCB selected a sub-set of those abilities to test using the T-Tab: Map Reading; Visualization; Reading Plans (Visual Scanning test); Problem Sensitivity (Problem Identification test); and Inductive Reasoning (Number Groups test). (TT at p. 39; PX 28A at pp. 11-12; *see* DX 233 at p. 2.)

However, this sub-group did not include the most important abilities associated with the three technical jobs used to validate the T-Tab: the I/R Technician position, Outside Plant Technician position, and Frame Repair Attendant position. (TT at pp. 39-46; PX 24 at p. 5; PX 24A at p. 7; PX 28A at pp. 5-11; TT at pp. 905-07.) For example, in one of the background studies, Inductive Reasoning ranked fifteenth (along with two other abilities), out of twenty-six, in importance for the I/R Technician Job, twelfth for the Outside Plant Technician job and ninth (along with four other abilities) for the Frame Repair Attendant job. (PX 24 at p. 5; TT at pp. 39-41.) On another SCB study,

> Inductive Reasoning was a below-average rated ability and had low rank order values for two of the three install and repair jobs. Furthermore, [the abilities measured by the T-Tab] consistently ranked in the lower one-half of the distribution of ability ratings indicating that other abilities were of greater importance or had a greater level of need for successful job performance.

(PX 28A at p. 12.)

Because the validation studies for the T-Tab test did not measure important abilities associated with the three technical jobs studied, the studies were fatally defective.

C.    **The T-Tab Test's Grouping of Jobs**.

The Uniform Guidelines authorize the grouping of jobs for criterion-related

validation purposes only where the grouped jobs have "substantially the same major work

behaviors." 29 C.F.R. § 1607.14(B)(1); *see* 29 C.F.R. § 1607.7(B)(2).  As noted earlier,

the validation study for the T-Tab test group involved three jobs: the I/R Technician,

Outside Plant Technician, and Frame Repair Attendant.  The various job analyses data

identified nineteen work components, but only one component (Reading and Interpreting

Technical Material) was common to these three jobs.  (PX 28A. at p. 13.)  Three

components were common to two of the jobs, while all the other components were unique

to one job.

In terms of the highest rated abilities required for the three jobs, an AT&T-

commissioned 1986 study by Schemmer & Cooper confirms that the three jobs do not

involve the same work behaviors:

| Outside Craft (Install & Repair) | Inside Craft (Frame Attendant) | Outside Plant Technician |
|---|---|---|
| Memorization | Memorization | Memorization |
| Knowledge of Tools & Uses | Oral Expression | Oral Expression |
| Mechanical Knowledge | Problem Sensitivity | Problem Sensitivity |
| Reading Plans | Written Comprehension | Written Comprehension |
| Visualization | Oral Comprehension | |

(*Id.* at p. 16.)  As the above chart shows, the only highly rated ability found in all three jobs

is memorization - - an ability which the T-Tab test does not purport to measure.  The three

jobs otherwise require difference sets of abilities.  Indeed, relying on the *Dictionary of*

*Occupational Titles*, another AT&T validation report explicitly recognizes that the three

jobs are different. *Id.* at pp. 17-18.

Similarity between jobs can be computed using a statistical index. (TT at pp. 245-46.) To indicate similarity, the researcher's computation should produce a "similarity index" of at least .7, but an index of .8 or .9 is preferable. (TT at pp. 246.) One of SCB's validation studies reported a similarity index of .3, which is well below acceptable levels. (TT at pp. 246-47.)

To be sure, there is some minimal evidence suggesting that the three jobs are similar, (*see e.g.,* TT at pp. 504-05, 807-08), but this evidence is greatly outweighed by evidence that the jobs do not involve "substantially the same major work behaviors." *See* 29 C.F.R. § 1607.14(B)(1);  29 C.F.R. § 1607.7(B)(2).

Accordingly, the Court finds and concludes that the validation studies of the T-Tab test are flawed due to their improper grouping of dissimilar jobs.

**D.    The Transportability of the T-Tab Results to Other Jobs.**

Transportability is an effort to apply the validity data for specific jobs to: (1) different jobs for which the researcher did not actually perform validity testing, and/or (2) jobs in different geographical locations or at different entities.

As noted earlier, an initial SCB validation study focused on three jobs:  I/R Technician, Outside Plant Technician, Service Technician, and Frame Repair Attendant. (*See* DX 216 at p. 12.)   Dr. Lundquist's subsequent re-validation efforts focused on six jobs including some, but not all, of the three used in the first validation study.  (*See* DX  2

pp. 1, 5.) However, both validation studies focused on a sub-set of the actual jobs for which SCB used the T-Tab as a screening device. Indeed, SCB used the T-Tab test as a screening device for at least seventeen jobs. (PX. 24 at pp. 2-3.) Not only did the corporate Defendants use the T-Tab to select for positions outside those job titles used in the validation studies, but they also used the T-Tab to select for positions in different geographical locations and at different entities. AT&T originally validated the T-Tab for its own use and later for use "throughout the Bell operating companies." (DX 233 at pp. 1-2; DX 216 at p. 19; *see* TT at pp. 580-81.)

Thus, SCB's transportability efforts were inappropriate. There were no statistically significant correlations between performance and test scores at SCB, as an individual entity. (TT at pp. 1053-55; PX 213.) If a test is not valid for the jobs studied, it follows that the test is invalid for purposes of transportability.[11] (TT at pp. 37-38; 936-37.)

In sum, the Court finds that the T-Tab validation studies for certain jobs were not transportable to other untested jobs .

**E.**    **The Effect of the T-Tab's Cut-off Score.**

SCB's use of thirty-nine as a passing score, or "cut-off" score, imposed an

---

[11] The Court has previously found that the T-Tab test is not valid for the jobs studied because: (1) the T-Tab did not predict performance, (2) the T-Tab did not measure the important abilities associated with the jobs studied, and (3) the T-Tab validation studies failed to group similar jobs.

unnecessarily high burden on its black employees, inconsistent with the Uniform Guidelines. (PX 24A at pp. 26-32, 50; PX 24 at pp. 15-17; TT at pp. 47-51, 264-65.) Under the Uniform Guidelines, "[w]here cutoff scores are used, they should normally be set so as to be reasonable and consistent with normal expectations of acceptable proficiency within the work force." 29 C.F.R. § 1607.5(H).

The evidence reflects insignificant differences in the job performance of those who passed the T-Tab test and those who did not. (TT at p. 50; PX 147 at ¶ 5; PX 147 at p.13.) Generally, those persons who failed the T-Tab test performed at the same level, or above, those who passed the test. (TT at p. 50; *see* PX 147 at ¶ 5; PX 147 at p.13.) The Court agrees with Dr. Barrett, who opined that

> [t]he cutoff score [of thirty-nine] did not reflect job performance. So there was no reason to make a very <u>severe</u> cutoff score like that.... In other words, by making a very stringent cutoff score, you maximized adverse impact against black employees, and of course the black applicants.... [L]owering the cut-off score to thirty ... almost double[s] the number of black employees who would be selected ...

without lowering job performance. (TT pp. 50-51) (emphasis added).

Accordingly, SCB's cut-off score did not comply with the Uniform Guidelines. (TT at pp. 51, 47-50); *see* 29 C.F.R. § 1607.5(H).


## F. **The Availability of Alternative Selection Procedures**.

The decision to use only the T-Tab tests to determine suitability for technical positions artificially limited the consideration of suitable alternative selection procedures

20

that may have had equal or greater validity, but less adverse impact.  Cognitive ability tests tend to have greater adverse impact than other kinds of tests, such as job knowledge tests, oral tests, short term memory tests, and personality tests.  (TT at p. 55.)  SCB never considered the use of these alternative selection procedures, other than to review the published and unpublished literature on the subject. (*Id.* at p. 607.)

### IV. CONCLUSION

For the reasons explained herein, this Court finds that SCB failed to validate its use of the T-Tab test to screen applicants for technical jobs.  Accordingly, SCB failed to establish that its use of the T-Tab test was job related.  Finally, SCB failed to consider appropriate alterative selection methods.  Consequently, SCB's use of the T-Tab under the present facts constituted a violation of Title VII.

The Court will separately issue a Declaratory Judgment and the case will proceed to a Phase II trial on damages.

Done this ___10th___ day of September, 2002.

_____
Chief United States District Judge
U.W. Clemon